and No. 181121, ACBel v. Fairchild. Good morning, Your Honors. I represent ACBel in this appeal, and I'd like to spend this morning focusing on point one of our brief, which concerns our warranty claim. The voltage regulators that ACBel bought from Fairchild were defective. Thousands of them failed. Fairchild and the district court say that we needed to prove foreseeability in order to win, that there is no defect unless the manufacturer could have foreseen the defect, no matter how bad the problem, no matter if the product failed completely. But there are two types of warranty claims in Massachusetts, tort and contract. And foreseeability is limited to tort cases involving dangerous products and personal injuries. Aren't you just saying that Massachusetts, like most other states, recognizes the implied warranty of merchantability, and that means that it's fit? It's a promise that it's fit, even if I don't know something's wrong with it for its intended uses, as long as it's used the way that people expect it to be used? Exactly, Your Honor. And our case was a contract case involving a defective product and economic loss. And as Your Honor suggested, there's a number of cases in Massachusetts, the Bay and the Hudson installation, that expressly confirm that. Is there some evidence in the record, and I'm not sure procedurally what it would be, is there some evidence in the record that the way it was used was not foreseeable, which would then rebut the implied covenant? Absolutely not, Your Honor. Some heat being applied to it or something like that? No, Your Honor. I'm going to find the actual statement, but Fairchild confirmed in its stipulated facts that the, or its proposed findings of fact, that we, that is, Act Bell, used the voltage regulator in a typical manner. And the voltage regulator was simply put into a power supply unit. That's what they are built for. And what stipulation are you referring to? I am referring to JA2437, which is in the record, and 2451, which is statements that we used it in a typical manner. And in fact, the testimony was that as well. Now, you mentioned heat, and what you might be referring to, Your Honor, is the soldering. So a voltage regulator can only be used if it's put on something. And how is it put on something? Soldering. That's how the product has to work. It can't, it doesn't do anything else other than that. And there was clear evidence that the soldering that Act Bell used conformed to industry practice. Are Act Bells was industry practice? Fairchild would certainly expect us to put it in with soldering, because that's the only way you can use it. And there's also evidence in the record that Act Bell complied with Fairchild's directions about soldering. So just so I follow, if you're right on question one, your position is we have to reverse not vacate on this issue, on the implied warranty amount? That you have to reverse the core and I say fine, five bucks. Five for you. And then am I right that their only arguments against that have to do with their veil piercing argument? Assuming you're right on this issue, the only way you could lose then is if they're right on the veil piercing point they make and the sanctions point. Yes, Your Honor, although the sanctions point, which is the only issue in their cross appeal, doesn't address the decision you're talking about. It just says if it goes back to trial, they want some relief. They don't say it affects this court's ruling for that. In terms of the veil piercing, absolutely, Your Honor. Although, as I think we tried to make clear in our papers, Judge Casper did not engage in a veil piercing. She found facts that the Asian subsidiaries acted as the U.S. parent's agent. And that's why the U.S. parent is responsible. Let me ask you about that. She didn't point, as I understood it, in making that ruling. She seemed to say they dominated them, therefore they were their agent. To be an agent, don't you need to have the principle conveyed to the other party that the intermediary is authorized to act as an agent? That's certainly an important part of it, but not necessarily. And here, there's lots of record. In fact, most of the trial was on this. The foreseeability issue wasn't really part of a trial, and it somewhat surprised us. But we, for instance, Your Honor, one of the key documents is the 8D corrective report, which talks about the problem. And that's 6-5-6-5 in the record. Although my handwriting is bad and it might be 6-3-6-5, I apologize. The 8D corrective action reports issued about this very voltage regulator says to ActBell that the failure analysis, that's the 8D corrective report, is performed as a technical service to the users of microcircuits manufactured by Fairchild Semiconductor Corporation. They were telling us and everybody else who read this, including the subsidiaries, that this was their product. Was that before or after the fact, that document? This was in the midst of the... Before or after the sale? This was after the particular sales that gave rise as part of the commercial relationship. However, this is a type of activity that testimony showed throughout the trial that Fairchild's subsidiaries. We know that ActBell directly negotiated prices with Fairchild. That was a finding of fact. We know that Fairchild set the prices. That's finding of fact 64. We know that Fairchild had the ability to change prices. That's finding of fact 69. We know that Fairchild marketed itself as a single global brand, not a subsidiary and not corporate USA over here, but as one brand. That's finding of fact 5. Fairchild and its subsidiaries together shared a common interest in advancing the brand, finding of fact number 9. They all used the exact same logo, finding of fact 14. Some of those facts, the latter three that you just mentioned, are true of a large number of wholly owned subsidiaries. They use the same brand. They have common ownership. They have the same interests. Some of that may be fodder for building with additional stuff some piercing argument, but for your agency argument, unless you're saying we've got a case of an undisclosed principal, then don't you need to restrict yourself to communications that manifested that Fairchild, Carrillo, or Hong Kong were authorized to act on behalf of Fairchild Parent? Well, there was evidence in the record, and I'm sorry I don't have this right here, but that Fairchild USA's employee Eric Hertz, in fact, signed things on behalf of Fairchild Hong Kong. I can get that citation for you. We have corporate charts showing that the we know in this issue Again, I'm trying to get you to focus on, if you want to say, hey, I was dealing with Joe, and Joe should be treated as Mary's agent, you would normally say, because Mary told me Joe was her agent, or because Mary knew Joe was telling me that Joe was her agent. Usually there's some communication to the party who wants to rely on the agency relationship to get at the principal, and I'm asking you to hone in on those issues. I understand that, Your Honor, and much of the trial also involved discussions of Fairchild USA conveying that the subsidiaries worked for Fairchild USA. The common global brand goes just to that. Fairchild was telling its customer, and it referred to Actel as its foreign subsidiaries. These are all findings of fact that are not disputed by Fairchild in terms of Judge Casper's decision. If you were to win on this first claim, what's then left for us is the conjuries of misrepresentation claims, is that right? If we were in our foreseeability, it's our position that the record supports that there is a misrepresentation claim, and that a finding of breach of the implied warranty of mercantility is the judgment. Then you're right, Your Honor. Then there becomes a question of whether or not Judge Casper properly dismissed our fraud-like claims on summary judgment. Okay, and on that, you're just asking us to vacate that ruling? You haven't moved for summary judgment? Fairchild moved for summary judgment to dismiss our claims, and that's what we want vacated. You just want that vacated. We want that vacated so we can go to trial on the questions of concealment. Okay, and now, just so I understand the nature of this claim for misrepresentation, are you saying that there was a pre-sale misrepresentation? Yes, there was a pre-sale misrepresentation. There's a few things going on, but let me address that very narrow question. You're talking about a pre-sale misrepresentation. It is industry practice for a seller to change the part number when it changes the part. When it sold us the defective voltage regulator. So, again, so that's going to be, you're going to claim there was an affirmative misrepresentation pre-sale? Yes. Okay. With respect to the omission claim, failure to disclose, are you making any claim that that occurred pre-sale? No, the omission... All of that's post-sale. The omission... The only pre-sale misrepresentation claim you bring to us is the affirmative misrepresentation claim. Is that right? Well, I think, Your Honor, that it's not exactly clear. Let me back up on the statement I said yes. Fairchild knew about defects or potential defects and continued to sell the defective voltage regulator to Ackbell. So that is a pre-sale omission. So you're talking post-May of 2010? Correct. There were sales that are at issue in this case? Yes. Well, I want to get the exact dates right. They stopped selling the defective voltage regulator in Week 35. At that point, as you know, they didn't tell us they were changing, but that's when they stopped selling the defective voltage regulator. Prior to Week 35, they had reports in the field from their other customers saying that there were They didn't tell us that. So they should have told us that while they continued to sell us the defective voltage regulators. But I really think the more important omission happens when they decide they are not going to sell the defective voltage regulator any longer in Week 35, and they do that very quietly. They don't change the part number. But that occurs post any sales at issue in this case, right? By just your own account, that occurs post any sales in this case. Now I'm talking about some separate... Let me try and be clear. I think before Week 35, there is evidence that Fairchild was aware of the potential defect, and did not tell us. Do we have anything in the record that indicates at what point that occurred? Because that can only then apply to those sales that occur after their awareness. That is in, starting I think in around May, and I can get the exact date, but in around May, which is before Week 35, they began, the other customers began to run their tests. Did you make an argument to the district court that that is one of the reasons why you should win and able to defeat their summary judgment argument? Well, we said that there are a number of different ones, and whether or not we... We certainly told the district court that there was knowledge of the defect as early possible as May of that year, and that when they finally stopped selling the defective product to us, that's when they had a duty to tell us, because as I think we try to make clear here, had they told us in Week 35, everything would have changed. Now, Fairchild is still selling us products. We still have a commercial relationship with them. So they're selling us now the non-defective ones. Well, that's another thing I'm trying to figure out. Is this pre-sale, post-sale distinction make sense in this case? I don't think so, Your Honor. I'm just not... I think it makes sense because I was really trying to answer your precise question, but the real problem here is that we introduced expert testimony to say Fairchild had a duty to let us know about the defect, even after they sold us the product. We had expert testimony that said that. But do you have any... Help us on the legal... Do you have... If I sell you a widget, and the sale's over, and you've got the widget, and then a month later, I discover from another customer that there's a defect with that widget, but let's assume it doesn't threaten personal safety for someone. Do I have a legal duty to call you up and say that widget I sold you a month ago has a defect? Yes, you do, Your Honor. What do you point us to for that? There's a circuit court case that says it very clearly from Judge Posner. And you think that's clear evidence of what Massachusetts law is? No, that's not. But there's also Massachusetts case, but he is clear on that. What's the Massachusetts case? That is... I'm sorry that's taking me too long to find this. Fraud cases, yes. We have... The Judge Posner case is an AMPAT Midwest versus Illinois tool, which I think states the principle very clear. In VSH Realty versus Texaco, there was a partial disclosure. And in Massachusetts, this court... What's that one? VSH Realty versus Texaco. And it's in our brief, so you can find the site. And the quote says, a party, quote, who discloses partial information that may be misleading has a duty to reveal all the material facts. That's not the question. I sell you a widget. It's got a defect. I don't know it. I just sold you the widget. It had a defect, and I didn't know it. I then find out a month later after the sale that it had a defect. Do I have a legal duty to call you back? There's no partial disclosure here. The restatement says you do, and that's what Judge Posner was relying upon. So we didn't find a Massachusetts case that says that? You could read the restatement to say the opposite, since it says before. I read... I'm reading from Judge Posner, who I know cited the restatement, and I realize this court doesn't need to follow Judge Posner, or may choose not to, but he says the manufacturer has a duty to reveal to the buyer facts known to it that bear on the cause of a failure. Here... But if you just read the restatement, it refers to that duty arising to things before sale, I thought. Here, the sale is so ongoing, and they're not... But that's a different argument. I understand that analytically. Was that argument made to the district court? We made the omission argument. We never parsed it that carefully with the district court, but we did say that there are arguments... We said that they had a duty to tell us about the defect, and had they told us about the defect, we would have done something. The problem is Judge Casper decided the entire case on a reliance theory that didn't make any sense to us, and I can try to parse through it, but she says we couldn't have relied on their silence, because two years before, they sent us a product change notification that informed us of a different change. That doesn't make any sense to us, and that's really the only ground that she granted their motion for summary judgment. The rest of the stuff is, we don't know how she interpreted it, and so we don't know what she decided. But the ground that she decided, the reasonable reliance, is clearly wrong. Well, stick with that for a second, because isn't she saying, the PCN told you they were going to change it. It was then reasonable for you to believe that they did change it, after enough time went by, and yet the part number was still the same. So you knew that they were making changes while keeping the part number the same. I think that's her reason. Her reasoning is she said that we received conflicting information. She said we received conflicting information in 2008, that there was going to be a change, and then information that there wasn't a change because there's no part change number. Did you reserve time? I did reserve time. Because you owe her your direct time. I did not reserve time. You did not reserve time. I did not reserve time. Well, then you have one minute to finish. I think the court understands the foreseeability requirement was misused here, and we think this is a contract case, and we should win on the breach of warranty, and that the court should reverse the summary judgment motion and allow us to go to trial on our fraud claims. Thank you. Thank you. Mr. Anderson, good morning. Good morning, and may it please the court. Before I launch into my presentation, I do want to address the issue that was raised by Judge Barron. I think if you go to footnote 19 of our red brief, it's clear that both the restatement and Massachusetts law make clear that there is no duty to disclose arising from industry custom or anything else other than personal injury after the point of sale. There's no post-sale duty to disclose in Massachusetts. Let's look at how that works when there's a continuing course of conduct. So if you and I are in a buy-sell relationship, and I discover that I'm the seller, and I've sold you something that's defective, and I learn that it's defective at some point, and we're still buying and selling, is the suggestion that if we're coming to the end of our relationship or the last month of it, even though I'm still dealing with the same person, and even though I know I've sold you all that other stuff, and even though we're dealing with the exact same product, I get a free pass, I don't have to tell you anything about all those prior defective sales, even though I know it and I'm only on the hook for the last two or three sales that occur between us? I'm aware of no case, Your Honor, that suggests that the rule is any different in the context of some sort of ongoing relationship. Neither am I. But I'm not aware of any case that answers it one way or the other. And I'm just trying to get a sense of does it make a lot of sense, at least in an ongoing relationship like this, to think that somehow, now that we're down to the last one or two sales between us, if I just stay silent, then I'm only on the hook for the value of those two sales. But the 100,000 sales that occurred beforehand, I don't have to worry about. Your Honor, I don't think there is any reasonable way to distinguish an ongoing relationship here. And to be clear, all of these shrunk-dye voltage regulators were sold by the time that plaintiffs view the issue became live. And, frankly, under Judge Casper's- They're saying that the sales continued through week 35 and the first report of a defect from a customer came in in May of 2010. Although I'm not sure they argued that sequence. The brief seemed to focus more on your decision in July and August. Yes. I guess I would say two things here. First, it's clear from the summary judgment record that the report that came in was for a different part. And, in fact, if you look at Judge Casper's finding at trial, she finds that the particular conclusion that Fairchild Subsidiaries came to on this point was that that particular customer with the different part that used a similar design was overstressing the part. Judge Casper's finding at trial was that Fairchild and Fairchild Subsidiaries weren't aware of the particular problem here until after ActBell's report came in. But to go back to your original question, Judge Barron, I think the concept of an ongoing relationship in a situation where you have a manufacturer that is selling millions of parts to hundreds of different buyers, perhaps thousands of different buyers, is just too inherently unclear to draw a line there. I think the only line that courts have drawn, I think really the only reasonable line a court can draw, is the particular sale for the particular part. And I'd point out in page 45 to 46 of the record that's in the complaint, plaintiffs state that the sales were complete by the time that they should have been told. I know you want to talk about the first point about implied merchant warrantability, but since we started on this misrepresentation issue, your point about the post-sale immunity is not a word you'd choose, but it's effectively the same thing, post-sale immunity from any obligation to say anything, and I get that. The district court didn't reach that question. So is your contention that it's so clear under Massachusetts law that you want us to affirm the district court's grand summary judgment on the misrepresentation claims based on that ruling, even though the district court never passed on it, and even though there's no mass law addressing it directly? Your Honor, I think the response of post-sale duty is one that's a response largely to an argument that was not made to the trial court, at least was not made coherently. I would say you can also affirm based on what Judge Casper found in summary judgment. You want to ask if we couldn't. What do you want us to do? You can do it either way. Are you saying that it would make sense for us to affirm on the post-sale duty argument? Correct. Even though the district court never reached it, even though you don't have any mass case law addressing that issue? Yes. And I think the reason you can do it is because Massachusetts case law... I mean, I would say, Your Honor, I guess it would somewhat take issue at the point that there's no mass case law addressing that issue because the mass cases and the restatement both say that. They don't say that with this particular facts. But there's no law that says, given these particular facts, the result should be different. Just one last point on the misrepresentation claim. Your Honor, as I understand it, the plaintiffs are contending that apart from their misrepresentation claim of omission, they are also making an affirmative misrepresentation claim. Can they contend that that affirmative misrepresentation claim occurred prior to at least some sales? So my understanding is that their affirmative misrepresentation claim is that we failed to tell them that the part changed, or at least failed to change the part number. And I think that's easily answered by Judge Casper, which he does. And if I didn't agree with Judge Casper's analysis for some reason on that point, are there any sales that occur after that moment that are issued in this case? Well, all the sales occurred after you. All relevant sales occurred after the part changed and the product changed. If that's an affirmative misrepresentation, then the only way you can win is if we agree with Judge Casper on that point? Why is that not an affirmative misrepresentation? I think the claim is that it is an affirmative misrepresentation. And I think the answer to that is clearly that Actel was told and Actel was new about the product change. I think that's what I would say on that point. The change back? No, well, the change back is different. That occurred after the sale. Okay, so it was all the change back. The change back argument, that's all post-sale, and therefore would be covered by the post-sale point. Correct. Okay, last point on misrepresentation then is they made the argument that with respect to the failure to disclose, there was at least some pre-sale failure to disclose because there was a point in time at which they became knowledgeable of the defect and did not make Actel aware of it. What's your answer to that as a ground for vacating the summary judgment ruling on the misrepresentation claim? So as I understand their claims, my understanding is that the switch back or failure to disclose was all post-sale. I don't understand there to be a pre-sale failure to disclose. To the extent, all right, so I would say this. To the extent that there was a failure to disclose, and we make this point in our brief, that goes to the nay case. And this is the point that I think Judge Casper is going to on reliance when she was discussing the nay case. And what she said there is, look, Actel has been told it could get samples of the new design and it can test them. Actel didn't do that. And what the nay case from the SJC holds, if a seller gives you an opportunity to check for problems, as happened here, and you don't check, you can't reasonably rely on silence about problems that you didn't check for. And I think that's the answer to your question, to the extent there was some obligation to tell them before sales were made of these problems that may or may not have existed and Judge Casper found a trial Fairchild didn't know about. I think that would be the answer. To go back to Issue 1, I guess I would start, I'd like to start with the facts. Judge Casper decided this case after eight full days of trial, making 124 fact findings. And I think those findings resolved this case. To give some specifics, in findings 109 to 111, Judge Casper found that Fairchild's reliability testing complied with industry standards and produced no failures when the part was tested. And Judge Casper found in finding 107 that although the part failed for different customers in different environments, the total failure rate was below the industry's normal failure rate. She also found in finding 117 that Actel's problem may have resulted from extreme heat in Actel's soldering processes, which I think goes to the point that was made earlier about was there something unusual about this. And there was a finding directly on that point. In finding 122, she also found it was Actel's responsibility, not Fairchild's, to check whether the part was reliable after soldering. So in short, Judge Casper found that Fairchild was without fault here. And without fault, unless we're in a world of absolute liability in the law here, and the law is clear that we're not, Fairchild wins. But stay with that, because I thought we were in the world of a warranty here. And why does a warranty... I mean, if I warrant to you that this glass will hold water, even though I'm at no fault and it won't hold water, I'm liable for breach of contract, aren't I? Well, I guess I would say this. This goes to what this Court said about the question of reasonable fitness in the Osario decision. And on page 85 of Osario, this Court wrote, a product is reasonably fit, and that's the language everybody agrees here. It comes right from the statute. Reasonably fit for its purposes if the design prevents the reasonably foreseeable risks attending to the product's use in that setting. So that's the test. And to go to your analogy here, and I guess I should say, we know that the K7805 passed that test because Judge Casper found the failure mechanism here was undetectable by industry standard testing. And Vassallo defines that as passing the reasonably foreseeable risk test. To go to your example, Your Honor, if you took a glass and you put it through some sort of... That glass passed all the industry standard testing. You poured water in it, it worked fine. You went and you put it in some sort of extreme regime that afterwards caused the bottom to fall out. But now you've changed... Certainly the implied warranty only applies to uses that could reasonably be foreseen. But Judge Casper said something different. She said that the defect wasn't reasonably foreseeable. And it seems to me that's a very different thing. If we disagree with that, then we get back to whether the use could have been reasonably foreseen. Then those findings you cite may well support a fact finding for you that they put it to a use that wasn't foreseen. But she never so held that. So I think to say that the use being reasonably foreseeable is, in the modern world and the post-Vassallo world, too narrow a construction. Because if you remember in the Masanto case, the issue was insulation. The insulation was used for perfectly foreseeable use. They used it as insulation. But it still caused a problem, but that problem did not trigger liability because the problem was unforeseeable. If the issue then becomes, if the issue is I have to insure against any failure in any reasonable use for whatever the cause in whatever the circumstance, then it becomes one of product perfection. The only way I can meet that liability standard is to produce a product that never fails. And that's perfection. And the cases on implied warranty make clear that that is not the legal standard. So you end up then with a situation of, well, if the standard isn't perfection, and we know it's not perfection because the cases tell us it's not, where do we put the bar of fitness? I think the only rational place to put the bar of fitness, Your Honor, is where the cases in Osario and where the cases where... Why wouldn't the natural thing be to focus on materiality rather than foreseeability? I'm not quite sure what we would mean by materiality. Well, materiality from the perspective of the purchaser was a material defect. Because then you still get back to the issue of I have to prevent my product from not failing. Yeah, I would think that would be helpful to me as a purchaser. If that's true then, Your Honor, then we are at the standard of perfection. And that's absolute liability. Suppose we have an express warranty. I'm sorry, Your Honor? Suppose I give you an express warranty. This will work for that. I'm on the hook if it doesn't work, right? That's correct. That's because we have an express warranty. What do you mean by implied warranty of merchantability? Because the implied warranty... It's implied rather than express. Because the implied... To quote the Hannon case, the implied warranty of merchantability is not intended to guarantee high quality or perfection of detail. And in this particular case... It's intended to guarantee that it's suitable for the anticipated use. Or the preliminary use. And how is something suitable if it bursts into fire? Remember, this isn't a question of a manufacturing defect where something was built wrong and a product burst into fire. It's important to remember all of these voltage regulators worked. They worked when they were put in the PSUs. They didn't work for as long as Actel wanted them to, but they worked. So the question becomes then, for how long are they supposed to work? You see, you're just shifting between, I think, between materiality and foreseeability. Foreseeability focuses entirely on, from the seller's perspective, what should the seller have foreseen with respect to the failure. Materiality would be focusing on how significant is the failure for the utility of the product. And I would think for a warranty, it would make a lot more sense to focus on materiality than foreseeability, otherwise you start to wonder how useful the warranty is. Well, I think this goes back to... Perfection, if it's just a minor defect, if it's not something that would really affect the use of it, even though it's not perfect, fine. You might say that's not within the scope of the warranty. But if it's the kind of thing that you can say is material, it's just not a useful product that I purchased, then that's what the warranty is that I told you it would be. And whether I foresaw that it would be as bad as it is shouldn't really matter. So I think the response to that, Your Honor, would be that the standard cannot be materiality under the law. Because if it was... I mean, it's quite clear that if a product kills me, that's material to me. But the SJC has made it equally clear in Vassallo that if the reason it killed me was unforeseeable... Because there's no warranty. Manufacturers... Yes, Vassallo is an implied warranty claim. In the sense that there's no contract. So remember, we're talking here about an implied warranty, and it's an implied warranty claim based on the same statute. It just sounds in contract or sounds in tort. The only distinction courts have made between those two, the statute of limitations. The implicit warranty I make to those who I don't have a contract with might be different. So the implicit warranty is defined to be the same. It's a statutory construct, and the statute is the same. And I point out that the rationale that the SJC gives is in the Vassallo decision. And they say, look, the goal of the law... And they're not talking about contract law here. They're not talking about tort law here. They're just talking about law. The goal of the law is to induce conduct that's capable of being performed. And obviously, as the SJC pointed out in Vassallo, that goal doesn't get advanced by imposing liability for product failures that a manufacturer can't anticipate or avoid. And that's equally true if this is a warranty claim sounding in contract as if a warranty claim sounding in tort. Otherwise, you end up in the fairly absurd situation, which I think is the result of plaintiff's construct here, where if somebody had been killed by a voltage regulator here, their estate would have no claim. But Actel's claiming, well, wait a minute. We still have a claim because all we did was lose money. And that, Your Honor, I think can't possibly be correct. Thank you. Thank you. Thank you. Your Honor, could you give me one more minute for rebuttal? I wasn't sure. I don't remember. What does this record show? I did give you an extra minute. Well, fine. Oh, you used it. That's what I wasn't sure about. Well, I wasn't even remembering it. So you were ahead of the game. Thank you. Yes? No, you already used it. Okay. That's my thought. Thank you.